# EXHIBIT B

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**01/31/2024** at 09:35:00 AM

Clerk of the Superior Court
By Carla Boston,Deputy Clerk

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone: (619) 798-2006

**Counsel for Plaintiff**

# SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| RUSSELL STEPHEN,<br><br>              Plaintiff,<br><br>        v.<br><br>NUTRA HOLDINGS, INC., NUTRA HOLDINGS TWO, INC., AMAZON, INC., and JOHN WILLIAMS,<br><br>              Defendants. | Case No. 37-2023-00056505-CU-BT-CTL<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**<br><br>No Jury Demand |

1

**TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ..................................................................1

II.     NATURE OF THE ACTION ......................................................................1

III.    PARTIES ...................................................................................................2

IV.     RELEVANT BACKGROUND INFORMATION .....................................3

V.      REGULATORY BACKGROUND REGARDING UNAPPROVED DRUGS ............................5

VI.     THE SALE OF UNAPPROVED DRUGS ENDANGERS THE PUBLIC. ...................................6

VII.    DEFENDANTS MARKET AND SELL ANDROSURGE WITH DECEPTIVE AND UNLAWFUL "DRUG" CLAIMS. ....................6

VIII.   ANDROSURGE IS AN UNAPPROVED DRUG...........................................9

IX.     DEFENDANTS' ADVERTISING FOR ANDROSURGE IS DECEPTIVE AND MISLEADING, RENDERING THE PRODUCTS MISBRANDED. ...........................10

X.      DEFENDANTS FAILED TO COMPLY WITH 21 C.F.R. § 101.5. ............................11

XI.     DEFENDANTS' PRACTICES WERE "UNFAIR" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW. ............................12

XII.    DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW. ............................13

XIII.   PLAINTIFF'S PURCHASE OF ANDROSURGE AND RELATED INJURY ............................14

XIV.    DELAYED DISCOVERY ...........................................................................15

XV.     ADDITIONAL TOLLING ALLEGATIONS................................................15

XVI.    FIRST CAUSE OF ACTION .....................................................................16

XVII.   SECOND CAUSE OF ACTION .................................................................17

PRAYER FOR RELIEF ........................................................................................18

NO JURY DEMAND .............................................................................................19

i

Plaintiff Russell Stephen, on behalf of himself and the general public, by and through his undersigned counsel, hereby sues Defendants Nutra Holdings, Inc., Nutra Holdings Two, Inc. (collectively "Nutra Holdings"), Amazon, Inc., and John Williams (collectively "Defendants") and upon information and belief and investigation of counsel, alleges as follows:

## I.   JURISDICTION AND VENUE

1.     Jurisdiction is proper because Plaintiff is a citizen of California and because all claims are asserted under the laws of California and relate to a product that is sold in California and was purchased by Plaintiff in California.

2.     Venue is proper under Bus. & Prof. Code § 17203 because Defendants conduct continuous business in San Diego County and sold hundreds or thousands of the product at issue in this county.

## II.   NATURE OF THE ACTION

3.     Defendant John Williams is an individual and the founder and CEO of Nutra Holdings, Inc. and Nutra Holdings Two, Inc. (collectively "Nutra Holdings").

4.     At Defendant William's direction, Nutra Holdings manufactures, distributes, and sells a suite of unapproved new drugs under the "Jacked Factory" brand name, including Androsurge.

5.     Williams "oversees everything from marketing to product development."[1] He ordered, authorized, and approved the advertising and sale of Androsurge.

6.     At Defendant William's direction, Nutra Holdings markets Androsurge as a purported estrogen blocking and testosterone boosting supplement with claims that suggest the product can deliver benefits akin to those which prescription drugs would provide.

7.     These claims are contrary to those allowed by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), and subject any individual manufacturing or selling it to liability for the sale of an unapproved new drug.

8.     Nutra Holdings' representations mislead consumers into believing that Androsurge is safe and effective for its intended purposes.

9.     At all relevant times, Defendant Williams has aided and abetted the manufacturing,

---

[1] https://nutraholdings.com/team/john-williams/

FIRST AMENDED COMPLAINT
*Stephen v. Nutra Holdings, Inc. et al.*, Case No. 37-2023-00056505-CU-BT-CTL

marketing, distribution, and sale of Androsurge.

10.     Defendant Amazon markets and sells Androsurge, an unapproved drug, online. Amazon sells Androsurge to consumers throughout California and the United States.

11.     At all relevant times, Defendant Amazon has aided and abetted the marketing, distribution, and sale of Androsurge.

12.     Plaintiff Russell Stephen purchased and used Androsurge in reliance upon Defendants' deceptive and unlawful "drug" claims, and with the belief that the product was sold in compliance with state and federal regulations.

13.     Plaintiff used Androsurge as directed, but the product failed to deliver the advertised benefits, nor any results at all.

14.     Defendants promote Androsurge as capable of providing benefits akin to those prescription drugs would provide, when in truth, Androsurge cannot deliver the advertised benefits.

15.     This action is brought to remedy Defendants' unfair and unlawful conduct. Plaintiff seeks an order compelling Defendants to, *inter alia*: (1) cease their illegal marketing and sale of Androsurge as an unapproved new drug; (2) conduct a corrective advertising campaign; (3) destroy all unlawful products and labeling; (4) award Plaintiff restitution and service awards; and (5) pay costs, expenses, and attorney fees.

### III.    **PARTIES**

16.     Defendant Nutra Holdings, Inc. is a Delaware corporation headquartered in St. John's, Newfoundland.

17.     Defendant Nutra Holdings Two, Inc. is a Delaware corporation headquartered in St. John's, Newfoundland.

18.     Nutra Holdings owns, manufactures, distributes, and sells a suite of unapproved drugs, including Androsurge, under the "Jacked Factory" brand name.

19.     Nutra Holdings sells "Jacked Factory" products, including Androsurge, throughout California and the United States.

20.     Defendant John Williams is the founder and CEO of Nutra Holdings.

21.     Williams ordered, authorized, and participated in the long-term, fraudulent advertising

scheme complained of herein.

22.     Williams ordered, authorized, and participated in the unlawful labeling and sale of Androsurge complained of herein.

23.     Defendant Amazon, Inc. is a Delaware corporation with its principal place of business in Seattle, WA.

24.     Amazon markets and sells Androsurge online to customers throughout California and the United States.

25.     At all relevant times, Defendant Amazon has aided and abetted the marketing, distribution, and sale of Androsurge.

26.     Plaintiff Russell Stephen is a citizen of California who purchased Androsurge for personal consumption.

## IV.     RELEVANT BACKGROUND INFORMATION

27.     The

Dietary Supplement Health and Education Act (DSHEA) of 1994, which amended the Federal Food, Drug, and Cosmetic Act, transformed FDA's authority to regulate dietary supplements. Under DSHEA, **FDA is not authorized to approve dietary supplements for safety and effectiveness before they are marketed**. In fact, in many cases, firms can lawfully introduce dietary supplements to the market without even notifying FDA. Since DSHEA was enacted, the dietary supplement market has grown significantly. For example, the number of products has expanded nearly twenty times since 1994.[2]

28.     A January 2020 evaluation of 'Testosterone Boosting' supplements, published by the National Library of Medicine found that

[a]pproximately 50% of American adults consume dietary supplements to promote overall health and fill dietary gaps [4,5]. These over the counter "T boosters" are often taken with the hopes of raising endogenous [testosterone] production and doing this in a more "natural" manner.[3]

29.     Further the same study found 10.1% of supplements "contained components with data

---

[2] https://www.fda.gov/food/dietary-supplements/information-consumers-using-dietary-supplements

[3] Glemesha, Chase (2020)'*Testosterone Boosting' Supplements Composition and Claims Are Not Supported by the Academic Literature*; WORLD J MENS HEALTH 2020 Jan 38(1): 115-122.

*Available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6920068/.

suggesting a negative effect" on testosterone and insisted that "[p]atients should be informed that 'T booster' supplements may not have ingredients to support their claims." *Id.*

30.     In February 2019, the Journal of Sexual Medicine published a study titled *Testosterone Imposters: An Analysis of Popular Online Testosterone Boosting Supplements,* which examined the influence Defendant and similar companies have on the online supplement market."[4]

31.     This same study found:

> The growing role of the internet, combined with the receptiveness of many men to pursuing therapies that influence testosterone levels, emphasizes the importance of understanding T-Boosters hosted on Amazon.com.

*Id.*

32.     Although the study found that "T-Boosters are easily available online," the "investigation revealed that limited human studies have evaluated T-Boosters, resulting in no definitive findings of efficacy," and additionally warned that "[i]n the absence of additional human studies, patients should be cautioned before considering T-Boosters, given the availability of highly effective therapies approved by the Food and Drug Administration." *Id.*

33.     Moreover, consumption of over the counter "natural" or "herbal" purported testosterone boosters presents significant health risks. First, consumers risk purchasing and using a product that will endanger their health. Second, consumers risk purchasing a product that will not effectively treat their condition, forgoing actual treatment of that condition in lieu of an unapproved new drug which may not treat their condition.

34.     A 2017 case report examining a patient who had consumed one such purported "natural" testosterone booster found "[t]he risk of venous thromboembolic events is" "unclear with non-FDA-approved herbal supplements marketed as testosterone enhancers."[5]

35.     The study noted that:

---

[4] Balasubramanian, et al. *Testosterone Imposters: An Analysis of Popular Online Testosterone Boosting Supplements*, 16 J. SEXUAL MEDICINE 203-12 (Feb. 2019).

*Available at* https://www.sciencedirect.com/science/article/pii/S1743609518313821.

[5] Nguyen S M, Ko Ko N, Sattar A S, et al. (August 06, 2017) *Pulmonary Embolism Secondary to Testosterone-Enhancing Herbal Supplement Use*. Cureus 9(8): e1545. DOI 10.7759/cureus.1545.

*Available at* https://pubmed.ncbi.nlm.nih.gov/29018642/.

Decreased testosterone levels in men are often a normal sign of aging. Testosterone replacement therapy (TRT) is a well-established option for those with symptomatic hypogonadism related to low testosterone levels. Conversely, designer herbal supplements in the context of testosterone supplementation are poorly studied, yet remain popular among aging men who seek the well-known, often enhancing, effects of testosterone that involve muscle mass and sexual function/drive.

*Id.*

36.     The study further noted that

[i]n 2014, the Food and Drug Administration (FDA) issued a warning about the significant risk of venous clots secondary to testosterone product use. Testosterone-induced polycythemia is one of the proposed mechanisms for this increased clotting propensity. Increased thromboxane A2 receptor density on platelets and increased platelet aggregation have also been linked to testosterone treatment in men.

Id.

37.     Thus, there is "is an inherent risk for vascular events, such as pulmonary embolus, in testosterone supplement use." *Id.*

## V.     REGULATORY BACKGROUND REGARDING UNAPPROVED DRUGS

38.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

39.     A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1).

40.     Pursuant to 21 U.S.C § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA.

41.     Further, 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."

42.     Under 21 U.S.C. § 352(f), drugs are required to have adequate instructions for safe use.

43.     Pursuant to Title 21 of the Code of Federal Regulations, Part 310.528 (21 C.F.R. § 310.528) any OTC drug product that is labeled, represented, or promoted for use as an aphrodisiac, is regarded as a "new drug" within the meaning of section 201(p) of the FDCA (located at 21 U.S.C. § 355(p)).

## VI.  THE SALE OF UNAPPROVED DRUGS ENDANGERS THE PUBLIC.

44.     Unapproved new drugs "pose significant risks to patients because they have not been reviewed by FDA for safety, effectiveness or quality."[6]

45.     "Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality or whether their label is complete and accurate." *Id.*

46.     "Unapproved drugs have resulted in patient harm, and the [FDA] works to protect patients from the risks posed by these drugs." *Id.*

47.     Further, unapproved drugs lack "labels and prescribing information that has" "been reviewed by FDA for accuracy and completeness."[7]

48.     Consumers using unapproved drugs also run the risk of "unexpected and undocumented safety concerns due to lack of rigorous pre- and postmarket safety surveillance." *Id.*

49.     Additionally, unapproved drugs lead consumers in need of medical treatment to forego medically proven therapies.

## VII.  DEFENDANTS MARKET AND SELL ANDROSURGE WITH DECEPTIVE AND UNLAWFUL "DRUG" CLAIMS.

50.     Defendants market and sell Androsurge with claims which suggest that the product can affect the structure or function of the human body and cure, mitigate, or treat disease.

51.     These claims render Androsurge a "drug."

52.     However, Defendants failed to obtain FDA approval to market and distribute Androsurge in violation 21 U.S.C. § 355.

53.     Defendants manufactured, marketed, distributed, and sold Androsurge Estrogen Blocker & Test Booster ("Androsurge") in packaging bearing claims which suggest the product can mitigate, cure, or treat hormonal imbalance and affect the structure and function of the human body by increasing testosterone and decreasing estrogen.

---

[6] https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.

[7] https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs-and-patient-harm.

54. Specifically, the Androsurge label claims the product is an "estrogen blocker and testosterone booster" and "aromatase inhibitor" which can "block estrogen," and "harden physique."





55. Further, Defendants advertised Androsurge with claims that suggest the product can provide benefits akin to those of a prescription drug.

56. The Androsurge label, Nutra Holdings' "Jacked Factory" website, and Defendants' Amazon page for Androsurge contained the following claims, which show the product is intended to affect the structure and function of the body, and to cure, mitigate, treat, or prevent disease:

- "Estrogen Blocker & Testosterone Booster"

- "Test Booster"
- "Blocks Estrogen"
- "Improves Physique"
- "Harden Physique"
- "Aromatase Inhibitor"
- "Improves Strength"
- "Elite Estrogen Blocker for Men"
- "Elite Estrogen Blocker for Men: Androsurge is the first scientifically-dosed, non-proprietary blend, all-natural estrogen reducing supplement for men. Featuring research-supported ingredients such as grape seed extract and diindolylmethane (DIM)."
- "Optimize your natural potential for maximum muscle building. Androsurge works as a muscle builder by promoting muscle fullness during your training and reduce muscle catabolism."
- "Energy, Vitality, and Libido: Androsurge helps boost your overall energy levels so you can power through your day, workout sessions, & life with a sense of vitality you've never felt before. Feel an improvement in overall confidence, a boost in drive, a reduction of stress, and a relentless alpha drive."
- "Increase Focus & Gain Sharp Mental Clarity: Experience reduced brain fog and precision focus. Androsurge is the perfect supplement to keep you dialed in during your workouts or workday."
- "Be confident that each bottle of Androsurge is free from impurities and safe."
- "Estrogen Blocker & Physique Hardening Agent"
- "Aromatase Inhibitor & Natural Test Booster"
- "Supports Muscle Growth & Fat Loss"

57.     These claims suggest that Androsurge can decrease estrogen levels, increase testosterone levels, treat hormonal imbalance, and act as an aphrodisiac. Further, the claims render Androsurge a "drug" within the meaning of 21 U.S.C. § 321(g)(1) and an "aphrodisiac drug" within the meaning of 21 C.F.R. 310.528.

58.     A true and correct copy of the Androsurge page from Nutra Holdings' "Jacked Factory" website is attached hereto as **Exhibit 1**.

59.     The FDA maintains a database of drugs which it has approved at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm.

60.     Attached hereto as **Exhibit 2** are search results from this FDA database, showing that the search term "Androsurge" "did not return any results."

61.     Thus, Defendants failed to obtain FDA approval prior to marketing, distributing, and selling

Androsurge.

## VIII.   ANDROSURGE IS AN UNAPPROVED DRUG.

62.     The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

63.     Here, Androsurge is a "drug" for regulatory purposes because it is advertised as a product which will cure, mitigate, treat, or prevent disease such as hormonal imbalance or low testosterone and which will affect the structure or function of the body by increasing testosterone levels, decreasing estrogen levels, enhancing libido, and improving physique.

64.     The claims on the packaging and website of Androsurge render it an unapproved new drug.

65.     The FDA has determined that the following claims, which are similar to those Defendants make regarding Androsurge, constitute "drug claims":

- "Natural testosterone booster" (**Exhibit 3**, FDA Warning Letter to Unlimited Nutrition);

- "[I]ncrease estrogen and testosterone levels" (**Exhibit 4**, FDA Warning Letter to Star Health & Beauty, LLC);

- "Increase Lean Muscle Mass" (**Exhibit 4**);

- "Highly anabolic" (**Exhibit 5**, FDA Warning Letter to AndroPharm, LLC);

- "Increase Muscle Mass" (**Exhibit 5**);

- "Activate Numerous Anabolic Pathways" (**Exhibit 5**);

- "Explosive Muscle & Strength Gains" (**Exhibit 5**)

66.     A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 321(p)(1). Here, Androsurge is a "new drug" within the meaning of the FDCA because it is not generally recognized as safe and effective for its intended uses. *See* Title 21 of the Code of Federal Regulations, Chapter I, Subchapter D; 21 C.F.R. § 330.1.

67.     "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA. 21 U.S.C § 355(a); *see also* 21 U.S.C. § 331(d).

68.     Defendants have not received approval from the FDA to sell Androsurge.

69.     The sale of unapproved new drugs is illegal and dangerous. First, consumers risk purchasing and using a product that will endanger their health. Second, consumers risk purchasing a product that will not effectively treat their condition, forgoing actual treatment of that condition in lieu of an unapproved new drug which may not treat their condition. The FDA's regulatory regimen helps ensure that such products are kept away from consumers.

70.     Defendants' failure to comply with these regulations puts consumers at risk and gives them an unfair advantage over competitors that do commit the time and expense of complying with such necessary regulations.

71.     Androsurge does not qualify for the reduced level of regulation applicable to certain nutrition supplement products for several reasons. The challenged marketing materials neither describe the role of any nutrient or dietary ingredient intended to affect the structure or function in humans, characterize the documented mechanism by which any nutrient or dietary ingredient acts to maintain such structure or function, nor describe general well-being from consumption of any nutrient or dietary ingredient. 21 U.S.C. § 343(r)(6)(A).

72.     California also prohibits the sale of unapproved new drugs. Health & Saf. Code § 111550.

## IX.     DEFENDANTS' ADVERTISING FOR ANDROSURGE IS DECEPTIVE AND MISLEADING, RENDERING THE PRODUCTS MISBRANDED.

73.     It is unlawful to manufacture or sell misbranded drugs. 21 U.S.C. § 331(a), (b), (c), & (g).

74.     A drug is misbranded if "its labeling is false or misleading in any particular."[8] 21 U.S.C. § 352(a)(1).

If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the articles to which the labeling or advertising relates under the

---

[8] Under the FDCA, "'labeling' means all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). This includes websites associated with the products." *See Sandoval v. Pharmacare US, Inc.*, 730 Fed. App'x 417, 420 (9th Cir.  2018).

conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.

21 U.S.C.S. § 321(n).

75.     Defendants' deceptive efficacy representations regarding Androsurge described herein render the product misbranded pursuant to Cal. Health & Saf. Code § 110100 (adopting all FDA labeling regulations as state regulations), § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded."), § 111330 (drug label misbranded if false or misleading in any particular), and further violate Cal. Bus. & Prof. Code § 17200 (Unfair Competition Law "Fraudulent" Prong) § 17500 (False Advertising Law) and Cal. Civ. Code § 1750 (CLRA).

76.     Because Androsurge claims to treat conditions not amenable to self-diagnosis, directions are not and likely cannot be written such that a layperson can safely use this product to treat those conditions. The label of Androsurge therefore lacks "adequate directions for use," rendering the product misbranded. 21 U.S.C. § 352(f)(1); *see also* 21 C.F.R. § 201.5 ("'Adequate directions for use' means directions under which the layman can use a drug safely and for the purposes for which it is intended.").

77.     Plaintiff used Androsurge as directed, but it failed to deliver the advertised benefits.

## X.    **DEFENDANTS FAILED TO COMPLY WITH 21 C.F.R. § 101.5.**

78.     Pursuant to 21 C.F.R. § 101.5 §§ (a)-(b),

(a) The label of a food in packaged form shall specify conspicuously the name and place of business of the manufacturer, packer, or distributor.

(b) The requirement for declaration of the name of the manufacturer, packer, or distributor shall be deemed to be satisfied, in the case of a corporation, only by the actual corporate name, which may be preceded or followed by the name of the particular division of the corporation. In the case of an individual, partnership, or association, the name under which the business is conducted shall be used.

79.     Here, Defendants violate 21 C.F.R. § 101.5 §§ (a)-(c).

80.     Specifically, they violate 21 C.F.R. § 101.5(a) because the Androsurge label does not "specify conspicuously the name and place of business of the manufacturer, packer, or distributor."

81.     Defendants violate 21 C.F.R. § 101.5(b) because the Androsurge label does not bear Nutra Holdings' "actual corporate name." Rather, the label states that the product is "Manufactured for Jacked Factory." However, "Jacked Factory" is not a corporation, but a trademark controlled by Defendants.

82.     Further, pursuant to 21 C.F.R. § 101.5(d), supplement manufacturers are required to

11

provide a "statement of the place of business" on the product label, which

> shall include the street address, city, State, and ZIP code; however, the street address may be omitted if it is shown in a current city directory or telephone directory. The requirement for inclusion of the ZIP code shall apply only to consumer commodity labels developed or revised after the effective date of this section. In the case of nonconsumer packages, the ZIP code shall appear either on the label or the labeling (including invoice).

83.     Here, Defendants fail to provide "statement of the place of business" as required by 21 C.F.R. § 101.5(d).

84.     Specifically, Defendants fail to "include the street address."

85.     The label reads: "Manufactured for Jacked Factory, St John's, NL A1A 5SA1."



86.     Defendants' failure to include a street address as required constitutes a violation of 21 C.F.R. § 101.5(d)

## XI.     DEFENDANTS' PRACTICES WERE "UNFAIR" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW.

87.     Defendants' practices as described herein are "unfair" within the meaning of the California Unfair Competition Law because Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of this conduct to Defendants does not outweigh the

gravity of the harm to Defendants' victims.

88.    In particular, while Defendants' marketing and sale of Androsurge with "drug" claims as defined by 21 U.S.C. § 321(g) and absent FDA approval to do so allowed Defendants to realize higher profit margins than if they did not use unlawful marketing tactics, this utility is small and far outweighed by the gravity of the economic harm and potential physical harm Defendants inflict upon consumers. Further, the injury to consumers from Defendants' practices is substantial, not outweighed by benefits to consumers or competition, and not an injury that consumers themselves could reasonably have avoided.

## XII.    <u>DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW.</u>

89.    Defendants' practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because the marketing, sale, and distribution of Androsurge violates the Federal Food, Drug, and Cosmetic Act, as well as California's Sherman Food, Drug, and Cosmetic Law.

90.    Defendants' conduct described herein is "unlawful" because it violated the following portions of the Federal Food, Drug, and Cosmetic Act ("FDCA"):

- **21 U.S.C. § 331(a)**, prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";
- **21 U.S.C. § 331(b)**, prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";
- **21 U.S.C. § 352(f)(1)**, requiring drugs to have adequate directions for use;
- **21 U.S.C. § 355(a)**, prohibiting the sale of unapproved new drugs;
- **21 C.F.R. §§ 101.5(a)-(b)**, requiring supplement labels "to conspicuously" list "the name and place of business of the manufacturer, packer, or distributor" using the "actual corporate name";
- **21 C.F.R. § 101.5(d)**, requiring supplement manufacturers to provide a "statement of the place of business" on product labels.

91.    Defendants' conduct described herein also violates multiple provisions of California law including, *inter alia*:

- **Cal. Health & Saf. Code § 110100 *et seq.***, which adopts all FDA labeling regulations as state regulations;

- **Cal. Health & Saf. Code § 111330**, "Any drug or device is misbranded if its labeling is false or misleading in any particular.";

- **Cal. Health & Saf. Code § 110398**, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

- **Cal. Health & Saf. Code § 111440**, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";

- **Cal. Health & Saf. Code § 111445**, "It is unlawful for any person to misbrand any drug or device.";

- **Cal. Health & Saf. Code § 111450**, "It is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.";

- **Cal. Health & Saf. Code § 111550**, prohibiting sale of new drug unless approved under 21 U.S.C. § 355.

92.    Defendants' unlawful marketing and advertising of Androsurge constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

93.    Defendants' unlawful acts allowed them to sell more units of Androsurge, than they would have otherwise, and at a higher price and higher margin.

94.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

95.    Plaintiff also seeks an order for the disgorgement and restitution of all revenue received by Defendants from the sale of Androsurge.

### XIII.    PLAINTIFF'S PURCHASE OF ANDROSURGE AND RELATED INJURY

96.    Plaintiff Stephen purchased Androsurge from Defendant Amazon's website in 2023.

97.    When Plaintiff purchased Androsurge, he was seeking a safe and effective testosterone booster and estrogen blocker which was sold in compliance with FDA regulations and California law.

98.    Plaintiff purchased Androsurge believing it had the qualities he sought based on the product's labeling, website, and Amazon page and the natural assumption that products sold in stores and online by large companies would be sold in compliance with FDA regulations and California law.

99.    Plaintiff purchased Androsurge instead of competing products based on Defendants' unlawful conduct described herein.

100. Plaintiff suffered economic injury when he purchased Androsurge because it was not safe and effective and because it was sold in violation of FDA regulations and California law.

101. Plaintiff would not have purchased Androsurge had he known that the product was ineffective and sold in violation of federal and California law.

102. Androsurge was offered for sale in violation of California and federal law and has a value of $0 because it is both illegal and ineffective.

103. Plaintiff would consider purchasing Androsurge in the future if he could be assured that the product is (1) safe and effective and (2) sold in compliance with all FDA regulations and California law.

## XIV.   DELAYED DISCOVERY

104. Plaintiff Russell Stephen did not discover that Defendants' behavior was unfair and unlawful until September 2023, when he learned that Defendants had been selling Androsurge in violation of federal and California law. Until this time, he lacked the knowledge regarding the facts of his claims against Defendants.

105. Plaintiff is a reasonably diligent consumer who exercised reasonable diligence in his purchase and use of Androsurge. Nevertheless, he would not have been able to discover Defendants' unfair and unlawful practices and lacked the means to discover them given that, like nearly all consumers, he is not an expert on FDA regulations or California law pertaining to the marketing and sale of drugs.

## XV.   ADDITIONAL TOLLING ALLEGATIONS

106. At all relevant times, Defendants were aware that their marketing of Androsurge violated FDA regulations and California law.

107. As supplement producers and sellers, Defendants had a continuing and affirmative moral and legal obligation to refrain from marketing and selling supplements with claims that violate FDA regulations and California law.

108. Plaintiff had no duty and no reason to inquire as to whether Androsurge was marketed in violation of state and federal food safety laws. California, as a matter of economic regulation, places the burden of ensuring that supplements are safe, effective, and sold in compliance with FDA regulations and California law, on their manufacturers, not the general public.

109. Reasonable consumers, including Plaintiff, had no reason to suspect Defendants' unfair

15

competition and violations of federal and state law prohibiting the sale of unapproved and misbranded drugs.

110.    Defendants owed a special duty to Plaintiff, akin to a fiduciary duty, which they violated by marketing and selling Androsurge with claims that suggest the product can affect the structure or function of the human body or can treat, mitigate, or cure disease without obtaining FDA approval to do so. Defendants were aware that their conduct was oppressive and cruel, causing economic injury and discouraging consumers from seeking medically proven treatments, yet consciously continued these acts for years while knowing the extent of the harm it was causing. Equity and the public policy of California, embodied in its statutes, jointly demand, in such circumstance, that laches and tolling cannot apply in such a way to permit Defendants to continue to enjoy the fruits of their intentional, cruel, oppressive, and unlawful acts.

## FIRST CAUSE OF ACTION

### Unfair Competition Law,

### Unfair Prong, Bus. & Prof. Code §§ 17200 *et seq.*

111.    In both causes of action, Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

112.    The business practices and omissions of Defendants as alleged herein constitute "unfair" business acts and practices in that Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to Defendants' victims.

113.    Further, Defendants' practices were unfair because they violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA and the California Health and Safety Code.

114.    Moreover, Defendants' practices were unfair because the injury to consumers from Defendants' practices was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided or should be obligated to avoid.

## SECOND CAUSE OF ACTION

### Unfair Competition Law,

### Unlawful Prong, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

115. Defendants have made and distributed, in interstate commerce and in this county, a product that was marketed with unlawful "drug claims" without obtaining FDA approval to do so.

116. Defendants' conduct violated the following portions of the Federal Food, Drug, and Cosmetic Act ("FDCA"):

- **21 U.S.C. § 331(a)**, prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";

- **21 U.S.C. § 331(b)**, prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";

- **21 U.S.C. § 352(f)(1)**, requiring drugs to have adequate directions for use;

- **21 U.S.C. § 355(a)**, prohibiting the sale of unapproved new drugs; and

- **21 C.F.R. § 101.5(a)-(b)**, requiring supplement labels "to conspicuously" list "the name and place of business of the manufacturer, packer, or distributor" using the "actual corporate name";

- **21 C.F.R. § 101.5(d)**, requiring supplement manufacturers to list a "statement of the place of business" on product labels.

117. Defendants' conduct also violates other provisions of California law including, *inter alia:*

- **Cal. Health & Saf. Code § 110100 *et seq.***, which adopts all FDA regulations as state regulations;
- **Cal. Health & Saf. Code § 111330**, "Any drug or device is misbranded if its labeling is false or misleading in any particular.";
- **Cal. Health & Saf. Code § 110398**, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";
- **Cal. Health & Saf. Code § 111440**, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";
- **Cal. Health & Saf. Code § 111445**, "It is unlawful for any person to misbrand any drug or device.";
- **Cal. Health & Saf. Code § 111450**, "It is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.";
- **Cal. Health & Saf. Code § 111550**, prohibiting sale of new drug unless approved under 21 U.S.C. § 355.

118.   The challenged labeling and website statements made by Defendants thus constituted violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

119.   Defendants employed unlawful marketing tactics to induce Plaintiff to purchase a product that was of lesser value and quality than advertised and which was not safe and effective, or FDA approved.

120.   The marketing and sale of Androsurge described herein constitute violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

121.   Had Plaintiff known that Androsurge was offered for sale in violation of California and federal regulations, he would not have purchased it.

122.   Plaintiff suffered injury in fact and lost money or property as a result of Defendants' unlawful conduct: he was denied the benefit of the bargain when he decided to purchase Androsurge over competing products, which are legal, less expensive, and do not make drug claims on their packaging and web properties.

123.   Defendants' unlawful acts allowed them to sell more units of Androsurge than they would have otherwise, and at a higher price, and higher margin.

124.   Had Plaintiff been aware of Defendants' unlawful marketing tactics, he would not have purchased Androsurge, and had Defendants not advertised and sold Androsurge in an unlawful manner, Plaintiff would have paid less for it.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, prays for judgment against Defendants as follows:

A.   An award of restitution of $39 to Plaintiff Russell Stephen;

B.   A temporary restraining order, preliminary injunction, and permanent injunction;

C.   A service award of $4,000 to Plaintiff Russell Stephen for obtaining an injunction on behalf of the public;

D.   An order requiring Defendants to conduct a corrective advertising campaign;

E.   Declaratory relief that the conduct alleged herein is unlawful;

F.   Pre-judgment, and post-judgment interest; and

G.   An award of attorney fees and costs.

## **NO JURY DEMAND**

Plaintiff makes no jury demand.

DATED: January 31, 2024                              Respectfully Submitted,

**THE WESTON FIRM**
GREGORY S. WESTON

**Counsel for Plaintiff**

# EXHIBIT 1



**PRODUCTS    SHOP ALL    JF BRAND    REWARDS**

Search



JACKED-FACTORY

# ANDROSURGE
# ESTROGEN BLOCKER

★★★★★ 139 Reviews

## $39.99
or 4 interest-free payments of $10.00 with **sezzle** ⓘ

| Size | 60ct |

| Quantity | − | 1 | + |

**VIEW SUPPLEMENT FACTS**

○ Subscribe & save
   **15% Off + Free USA Shipping On All Recurring Orders**

◉ One-time purchase $39.99

⟳ SUBSCRIPTION DETAILS

**Add to cart**

Androsurge is the first scientifically-dosed, non-proprietary blend, all-natural estrogen reducing supplement for men. Featuring research-supported ingredients such as grape seed extract and diindolylmethane (DIM). Optimize your natural potential for maximum muscle building and fat loss. Androsurge works as a muscle builder by promoting muscle fullness during your training and reduce muscle catabolism.

Androsurge also helps boost your overall energy levels so you can power through your day, workout sessions, and life with a sense of vitality you've never felt before. Feel an improvement in overall confidence, a boost in drive, a reduction of stress, and a relentless alpha drive.



| Key Benefits | Ingredients | Supplement Facts |

- Estrogen Blocker & Physique Hardening Agent

- Aromatase Inhibitor & Natural Test Booster

- Supports Muscle Growth & Fat Loss

- Zero Fillers or Dyes

- Enhance Energy & Vitality

**JACKED FACTORY REWARDS** ⌃

# EXHIBIT 2

Case 3:24-cv-00546-GPC-BLM   Document 1-3   Filed 03/21/24   PageID.81   Page 26 of 46

**Drug Databases (https://www.fda.gov/Drugs/InformationOnDrugs/default.htm)**

# Drugs@FDA: FDA-Approved Drugs

**Home (index.cfm)** | **Previous Page**

**Modify Your Search**

### Your Drugs@FDA Search Did Not Return Any Results

Your search may not have returned results because of one of these reasons (see **FAQ (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=faq.page#searches_about)** for more search strategies to find approved drugs in Drugs@FDA):

- Drugs@FDA includes the drug you are looking for, but the drug's name was *not spelled correctly*. For your next search:
  - If you are not sure of the spelling of the drug name, use **Browse by Drug Name (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=browseByLetter.page&productLetter=A&ai=0)** on the Drugs@FDA home page to find drug names in alphabetical order.
  - If applicable, ensure that you include special characters or spaces that reside within the drug name in your search. For example, if you are searching for "H.P. ACTHAR GEL" or "X-TROZINE L.A." include the periods and/or the hyphen.
  - If you know part of the spelling of the drug name, include at least three characters from the drug name in the search box.

- Drugs@FDA does *not* include the drug you searched for because the drug:
  - Does not require FDA approval to be sold in the United States (Drugs@FDA only includes approved drugs). For example:
  - Over-the-counter (OTC) drugs marketed under the monograph system (See **OTC Drug Monograph Process (https://www.fda.gov/drugs/current-good-manufacturing-practices-cgmp-drugs-reports-guidances-and-additional-information/over-counter-otc-drug-monograph-process)** for more information.)
  - Dietary supplements (See **Dietary Supplements (https://www.fda.gov/food/dietary-supplements)** for more information.)
  - Is approved by FDA's Center for Biologics Evaluation and Research. These FDA-approved drugs are not included in Drugs@FDA. These drugs include vaccines, allergenic products, blood and blood products, plasma derivatives, cellular and gene therapy products, plasma volume expanders, and platelet additive solutions. (See **CBER's approved drugs (https://www.fda.gov/vaccines-blood-biologics/biologics-products-establishments)**.)
  - Is not marketed in the United States (for example, investigational drugs).
  - Is not for human use (for example, animal prescription and animal OTC drugs). (Drugs@FDA does not include animal drugs; for animal drugs see **Animal Drugs@FDA.) (https://animaldrugsatfda.fda.gov/adafda/views/#/search)**

- Your Application Number search did *not* include the appropriate number of digits for the application.

# EXHIBIT 3

<span style="color:blue">Case 3:24-cv-00546-GPC-BLM   Document 1-3   Filed 03/21/24   PageID.83   Page 28 of 46</span>

**Company:** Unlimited Nutrition
**Subject:** Dietary Supplement/Labeling/Misbranded
**Issuer:** Atlanta District Office
**Issued:** Aug. 30, 2010 **Closed:** Not Issued
**Source** ucm225605 **Archive Code:** 20170111135340

# Unlimited Nutrition 8/30/10

 **Department of Health and Human Services**

Public Health Service
Food and Drug Administration
Atlanta District Office
60 Eighth Street N.E.
Atlanta, GA 30309

August 30, 2010

**WARNING LETTER**
10-ATL-19

**HAND DELIVERED**

Mr. Mike McCandless, Owner
Unlimited Nutrition
Scivation, Inc., President
1130 Cherry Lane
Graham, NC 27253

Dear Mr. McCandless:

On February 16 - 17, 2010, the U.S. Food and Drug Administration (FDA) conducted an inspection of your facility located at 1130 Cherry Lane, Graham, NC 27253. We have also reviewed your firm's website, www.smartpowders.com .

This letter concerns your firm's marketing of the following products: "Smart Powders Piracetam," "Primaforce Piracetam," "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore." These products are marketed in violation of the Federal Food, Drug, and Cosmetic Act (the Act) as described below.

**Piracetam Containing Products**

Your firm markets your piracetam products, "Smart Powders Piracetam" and "Primaforce Piracetam" as dietary supplements; however, both products are excluded from the definition of a "dietary supplement" under section 201(ff)(1) of the Act, 21 U.S.C. § 321(ff)(1). To be a dietary supplement a product must, among other things, "bear[ ] or contain[ ] one or more ... dietary ingredients" as defined in section 201(ff)(1) of the Act. Section 201(ff)(1) of the Act defines "dietary ingredient" as a vitamin, mineral, amino acid, herb or other botanical, or dietary substance for use by man to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract or combination of any dietary ingredient from the preceding categories. The only substance listed as a dietary ingredient on the labeling for your "Smart Powders Piracetam" and "Primaforce Piracetam" products is piracetam. Piracetam is not a vitamin, mineral, amino acid, herb or other botanical, or dietary substance for use by man to supplement the diet by increasing the total dietary intake. Further, piracetam is not a concentrate, metabolite, constituent, extract or combination of any such dietary ingredient. Thus, because your "Smart Powders Piracetam" and "Primaforce Piracetam" products do not bear or contain any dietary ingredients as defined in section 201 (ff)(1) of the Act, these products do not qualify as dietary supplements under section 201(ff) of the Act. [1]

Your website and labeling include statements such as the following:

**Smart Powders Piracetam**

• "Piracetam supports memory and concentration, overall well-being, cardiovascular health, and helps reduce stress and fatigue."

**Primaforce Piracetam**

• "Piracetam supports memory and concentration, overall well-being, cardiovascular health, and helps reduce stress and fatigue."

The claims listed above make clear that "Smart Powders Piracetam" and "Primaforce Piracetam," are intended to affect the structure or any function of the body of man or other animals. Accordingly, these ·products are drugs, under section 201(g)(1)(C) of the Act, 21 U.S.C. § 321(g)(1)(C), because they are not foods and they are intended to affect the structure or any function of the body. Moreover, these products are new drugs as defined by section 201(p) of the Act, 21 U.S.C. § 321(p), because they are not generally recognized as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

Under sections 301(d) and 505(a) of the Act, 21 U.S.C. § 331(d) and 355(a), a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA approved application is in effect for it. There are no approved applications for "Smart Powders Piracetam" and "Primaforce Piracetam." Your sale of these products without approved applications violates these provisions of the Act.

**Body Building and Sport Performance Products**

In addition, your firm's body building and sport performance products "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" are unapproved and misbranded drugs under the Act.

Your website, www.smartpowders.com . states that your products contain the following ingredients:

• **Advanced Muscle Science Arom-X** : 1,4,6-etioallocholan-dione
• **Advanced Muscle Science 4-AD UTT** : 3,17-keto-etiochol-triene
• **G.E.T ArimaDex** : 3,17-keto etiochol-triene
• **iForce Nutrition Reversitol** : 6-Etioallochol-1 ,4-Diene-3,17-Dione
• **Fizogen Off Cycle II Hardcore** : 3 17 keto etiochol triene

The above-listed ingredient names are all synonyms for the same ingredient, commonly known as "ATD." "ATD" is an aromatase inhibitor. FDA is unaware of evidence that ATD occurs in vivo in humans or animals.

Your firm markets "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" as dietary supplements. To be a dietary supplement a product must, among other things, "bear[ ] or contain[ ] one or more ... dietary ingredients" as defined in section 201(ff)(1) of the Act. Section 201(ff)(1) of the Act defines "dietary ingredient" as a vitamin, mineral, amino acid, herb or other botanical, or dietary substance for use by man to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract or combination of any dietary ingredient from the preceding categories. ATD is not a vitamin, mineral, amino acid, herb or other botanical, or dietary substance for use by man to supplement the diet

by increasing the total dietary intake. Further, ATD is not a concentrate, metabolite, constituent, extract or combination of any such dietary ingredient. Therefore, ATD is not a dietary ingredient as defined in section 201 (ff)(1) of the Act, 21 U.S.C. § 321(ff)(1).

Your website includes statements such as the following:

**Advanced Muscle Science Arom-X**

- "Anti-estrogen complex."
- "Natural testosterone booster."
- "Libido enhancer."
- "Arom-X is scientifically formulated to suppress estrogen production and restore natural testosterone output while acting as a strong libido enhancer."

**Advanced Muscle Science 4-AD UTT**

- "4-AD UTT is a unique anabolic solution pro-hormone that converts at a high rate of testosterone (sic)."
- "[W]ill give you better strength and size increases than the old testosterone precursors."

**G.E.T ArimaDex**

- "A proprietary blend of 7 ingredients including an estrogen blocker ... that have all been shown to increase or maintain testosterone levels."

**iForce Nutrition Reversitol**

- "By regulating the production and levels of Testosterone, Estrogen, LH, and Cortisol an athlete will ensure PEAK. Performance Reversitol promotes the optimal Hormone Regulation for applying Maximum FORCE!"
- "Usage for promoting hormonal regulation ...."

**Fizogen Off Cycle II Hardcore**

- "Off Cycle" and "If you are subject to performance enhancing drug testing, do not use this product unless cleared by your sanctioning body"

The statements above make clear that "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" are intended to affect the structure or function of the body. Accordingly, these products are drugs under section 201(g)(1)(C) of the Act, 21 U.S.C. § 321(g)(1)(C).

As mentioned above, your firm markets "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" as dietary supplements. Under section 201(g)(1) (last sentence), the structure/function claims made for a dietary supplement must be made in accordance with section 403(r)(6) of the Act, 21 U.S.C. § 343(r)(6), or the product is subject to regulation as a drug. Section 403(r)(6) of the Act, 21 U.S.C. § 343(r)(6), authorizes claims that describe the role of a nutrient or dietary ingredient intended to affect the structure or function of the body, or that characterize the way in which a nutrient or dietary ingredient maintains the structure or function of the body.

However, the claims quoted above for your body building and sport performance products, "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore," do not describe the effects of nutrients or dietary ingredients in the products. Rather, the claims made for each product are made for the product as a whole and relate to its "ATD" content. Since "ATD" is not a nutrient or dietary ingredient, claims about improvement of the structure or function of the body do not conform to section 403(r)(6) of the Act, 21 U.S.C. § 343(r)(6). Accordingly, the claims for "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" render them drugs within the meaning of section 201(g)(1)(C) of the Act, 21 U.S.C. § 321(g)(1)(C).

Moreover, the above-listed body building and sport performance products are "new drugs," as defined by 201(p) of the Act, 21 U.S.C. § 321(p), because they are not generally recognized as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling. Under sections 301(d) and 505(a) of the Act, 21 U.S.C. §§ 331(d) and 355(a), a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA-approved application is in effect for it. Your sale of "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" without approved applications violates these provisions of the Act.

Furthermore, "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" are prescription drugs as defined at section 503(b)(1)(A) of the Act, 21 U.S.C. § 353(b)(1)(A), because, in light of their toxicity or other potentiality for harmful effect, or the method of their use, or the collateral measures necessary to use, they are not safe for use except under the supervision of a practitioner licensed by law to administer them. Indeed, all aromatase inhibitors that have been approved for marketing by the FDA are limited by an approved new drug application to use under the professional supervision of a practitioner licensed by law to administer such drug.

According to section 502(f)(1) of the Act, 21 U.S.C. § 352(f)(1), a drug is misbranded if, among other things, it fails to bear adequate directions for its intended use(s). Under 21 C.F.R. § 201.5, "adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended. Prescription drugs can only be used safely at the direction, and under the supervision, of a licensed practitioner. Therefore, it is impossible to write "adequate directions for use" for prescription drugs. FDA-approved drugs which bear their FDA-approved labeling are exempt from the requirement that they bear adequate directions for use by a layperson. See 21 C.F.R. §§ 201.100(c)(2) and 201.115. Because there are no FDA-approved applications for your firm's "Advanced Muscle Science Arom-X," "Advanced Muscle Science 4-AD UTT," "G.E.T ArimaDex," "iForce Nutrition Reversitol," and "Fizogen Off Cycle II Hardcore" products, their labeling fails to bear adequate directions for its intended uses, causing it to be misbranded under section 502(f)(1) of the Act, 21 U.S.C. § 352(t)(1). The introduction or delivery for introduction into interstate commerce of these misbranded products violates section 301(a) of the Act, 21 U.S.C. § 331(a).

The issues and violations cited in this letter are not intended to be an all-inclusive statement of the violations that exist in connection with your products. You are responsible for investigating and determining the causes of the violations identified above and for preventing their recurrence or the occurrence of other violations. It is your responsibility to ensure that all products marketed by your firm comply with the Act and its implementing regulations.

You should take prompt action to correct the violations cited in this letter. Failure to promptly correct these violations may result in legal action, without further notice, including, without limitation, seizure and injunction. Other federal agencies may take this Warning Letter into account when considering the award of contracts.

Within fifteen (15) working days of receipt of this letter, please notify this office in writing of the specific steps that you have taken to correct violations. Include an explanation of each step being taken to prevent the recurrence of violations, as well as copies of related documentation. If you cannot complete corrective action within fifteen working days, state the reason for the delay and the time within which you

will complete the corrections. Furthermore, please advise this office what actions you will take to address product that you have already distributed.

Additionally, if another firm manufactures the products identified above, your reply should include the name and address of the manufacturer. If the firm from which you receive the product is not the manufacturer, please include the name of your supplier in addition to the manufacturer.

Please send your reply to Derek C. Price, Compliance Officer, U.S. Food and Drug Administration, 60 Eighth Street, N.E., Atlanta, GA 30309. If you have any questions about the content of this letter, please contact Mr. Price at 404-253-2277.


Sincerely
/S/
John Gridley
District Director
Atlanta District Office

[1] We note that in 2003, **(b)(4)** submitted a New Dietary Ingredient Notification (NDIN) for piracetam, naming your firm as the distributor, pursuant to section 413(a)(2) of the Act, 21 U.S.C. §350b. Section 413(a)(2) of the Act requires premarket notification to CFSAN prior to the introduction of a new dietary ingredient into interstate commerce. The NDIN is required to contain infonnation which is the basis for the conclusion that a dietary supplement containing such new dietary ingredient will reasonably expected to be safe. CFSAN's response letter
to Mr. **(b)(4)** NDIN, which was issued on January 9, 2004, stated that piracetam is "not a dietary ingredient."

# EXHIBIT 4

**WARNING LETTER**

# Star Health & Beauty LLC

**MARCS-CMS 516206 — MAY 26, 2017**

**Recipient:**

Star Health & Beauty LLC
United States

**Issuing Office:**

Atlanta District Office
United States



Atlanta District Office
60 Eighth Street N.E.
Atlanta, GA 30309

May 26, 2017

**VIA UNITED PARCEL SERVICE**
**NEXT DAY - SIGNATURE REQUIRED**

Mr. James W. Dukes, Chief Executive Officer (CEO)
Star Health & Beauty LLC
14500 Lochridge Blvd Ste E
Covington, GA 30014-4941

**WARNING LETTER**
**(17-ATL-08)**

Dear Mr. Dukes:

This is to advise you that the Food and Drug Administration (FDA) reviewed your website at the Internet address, www.s-h-b.com in May 2017 and determined that you take orders there for the products Nu Essentials Royal Jelly Capsules, NuMan Male Enhancement Capsules, Star's Male Potency Tonic, Sculpting Crème, Royal Touch – Anti-Wrinkle Serum, Realyze Under Eye Seryum, proEASE Wild Yam Cream, ProK

Professional Strength Vitamin K Cream, proDHEA™ Transdermal DHEA Cream, Professional Formulas Natural Analgesic Cream, proGen Anti-Aging Natural Growth Hormone Precursor Cream, ProPhytogen Cream, Sensual Lips, Sun Warrior Ginsing Moisturizer™, NuGen HP, She Max HP, and V Max HP. The claims on your website establish that the products are drugs under section 201(g)(1)(B) and/or 201(g)(1)(C) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 321(g)(1)(B) and/or 201(g)(1)(C)] in that they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease and/or intended to affect the structure or any function of the human body. As explained further below, introducing or delivering these products for introduction into interstate commerce for such uses violates the Act. You can find the Act and its implementing regulations through links on FDA's home page at http://www.fda.gov (http://www.fda.gov/).

FDA also inspected your drug, dietary supplement and cosmetic products manufacturing facility, Star Health & Beauty LLC, at Covington, GA, from October 17 to 26, 2016. Based on our inspection, we found serious violations of the Current Good Manufacturing Practice (CGMP) regulation for Manufacturing, Packaging, Labeling or Holding Operations for Dietary Supplements, Title 21, Code of Federal Regulations, Part 111 (21 CFR Part 111). These violations cause your dietary supplement products to be adulterated within the meaning of section 402(g)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 342(g)(1)], in that they have been prepared, packed, or held under conditions that do not meet the CGMP regulations for dietary supplements found under 21 CFR Part 111.

In addition, our investigators identified significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals, Title 21, Code of Federal Regulations, Parts 210 and 211. These violations cause your drug products to be adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. 351(a)(2)(B), in that the methods used in, or the facilities or controls used for, their manufacture, processing, packing, or holding do not conform to, or are not operated or administered in conformity with, CGMP."

At the conclusion of the inspection, you were issued a Form FDA 483 detailing our investigator's observations during the inspection. We did not receive a letter with your response to the observations.

**Unapproved New Drugs**

Examples of some of the claims that provide evidence that your products are intended for use as drugs include:

**Nu Essentials Royal Jelly Capsules**

     o  "Royal Jelly helps your body protect itself from viruses and can aide in preventing colds and infections..."
     o  "[I]mmune protection…fights against bacteria…antidepressive…"

**NuMan Male Enhancement Capsules**

     o  "[M]uira Puama is one of the best herbs to use for erectile dysfunction…"

**Star's Male Potency Tonic**

     o  "[U]sed as a remedy for impotence…"
     o  "[B]eneficial for prostate enlargement and infections."

**Sculpting Crème**

     o  "Sculpting Crème eliminates and prevents the accumulation of fats and wastes that become trapped in the susceptible cells just below the skin."
     o  "[S]timulates microcirculation to help your body reduce fat deposits."

**Royal Touch – Anti-Wrinkle Serum**

     o  "Natural Botox Alternative"
     o  "[S]timulate collagen growth…reduction of deep wrinkles…"
     o  "[P]revent aging of the skin …"
     o  "Emu Oil contains…healing properties…known to repair skin damage."

**Realyze Under Eye Seryum**

- o "Suppresses inflammatory enzymes, decreasing puffiness and swelling"
- o "Strengthens capillaries, arteries and veins…"
- o "It promotes collagen formation, thereby increasing capillary blood circulation, retards capillary leakage, reduces melanin production…to reduce swelling…"
- o "Vitamin K…stimulates Epithelial growth…"
- o "Vitamin C – Helps to protect against damaging UVA/UVB rays…and stimulates collagen production…"
- o "Hexapeptide 3… reduces wrinkles… Also has been shown to prevent aging of the skin…"
- o "Marine Collagen…helping cells to renew themselves… "
- o "Emu Oil - … Vitamin E: anti-oxidant and healing agent…."
- o "Vitamin E…healing agent, Vitamin A…skin repairer, Terpines: an antiseptic…"

**proEASE Wild Yam Cream**

- o "Women…their first choice in addressing PMS and other hormone related issues."
- o "Users experience less PMS symptoms, reduced stress and increased vitality."
- o "To relieve cramping… apply the cream to the abdomen each half hour until the cramping subsides."
- o "With hot flashes…apply…cream each time they have a hot flash."

**ProK Professional Strength Vitamin K Cream**

- o "[S]timulates epithelial growth and promotes…clarification of the damaged skin."
- o "Helps eliminates (sic) spider veins (dilated or broken capillaries) and bruising…"
- o "[C]osmetic surgeons…use it for pre & post operative treatment to reduce post operative bruising, swelling, and to speed up the healing process and diminish scarring."
- o "[C]lots the blood…"

**proDHEA™ Transdermal DHEA Cream**

- o "Boost Immune Function"
- o "Increase Lean Muscle Mass"
- o "Reduce Body Fat"
- o "Reduce Stress"
- o "Combat Depression"
- o "Enhance Sexual Drive & Desire"
- o "Improve Memory"
- o "Helps Prevent Osteoporosis & Cardiovascular Disease"
- o "[I]ncrease estrogen and testosterone levels… increase IGF-1, increase lean body mass, and decrease appetite."
- o "[I]mprove quality of sleep, decrease joint pain…"

**Professional Formulas Natural Analgesic Cream**

- o "[L]ower blood pressure."
- o "[I]ncreasing the blood supply, it reduces inflammation."
- o "[A]nti-inflammatory properties."
- o "[H]ighly effective in treating rheumatoid arthritis."

**proGen Anti-Aging Natural Growth Hormone Precursor Cream**

- o "[A]cts as a precursor which may induce the pituitary to increase production of the bodies (sic) own natural HGH."
- o "[M]ay assist in slowing down and even reversing the… aging process."
- o "HGH is one of many endocrine hormones…"
- o "Not only does it suppress biological aging…"
- o "HGh affects almost every cell in the body…"
- o "[S]trong anti-phlogiston (inflammation reducing) effect."
- o "[V]ery powerful anti-inflammatory… more effective than aspirin in reducing inflammation and pain."

- o  "[T]reat swelling, inflammations, and sprains."
- o  "[R]elieve pain …"
- o  "[R]educe inflammation …"
- o  "[R]elieved stiffness…"
- o  "It's (sic) medicinal values include anti-inflammatory, antiseptic, carminative, antispasmodic and sedative as well as promoting wound healing."
- o  "HGH has been found to reverse and/or slow down the aging process by:
  - § Restoring Muscle Mass
  - § Decreasing Body Fat
  - § Thickening of the skin
  - § Improving cholesterol profile
  - § Increasing sexual function
  - § Improving Memory
  - § Elevating Mood
  - § Normalizing blood pressure
  - § Increasing cardiac output and stamina
  - § Improving Immune Function
  - § Restoring lost hair growth
  - § Restoring size of organs that shrink with age
  - § Improving Sleep
  - § Increasing Energy"

**ProPhytogen Cream**

- o  "[C]ontains phyto-hormones thatare identical to the human estrogens estradiol, estriol, and estrone…"
- o  "It has a stabilizing effect on the entire endocrine system, calming hot flashes and night sweats, and restoring normal sleep patterns…"
- o  "[E]xhibits dh-Testosterone blocking qualities to help reduce … facial hair growth."
- o  "Black Cohosh Known….To restore healthy menstrual activity."
- o  "Stimulates estrogen, cortisone and aldosterone production…"
- o  "Assists with menopausal symptoms, helps to regulate menstruation and PMS."
- o  "Helps liver problems, heart palpitations, high blood pressure, hypoglycemia and chronic bronchitis."
- o  "Used to dissolve blood clots, strengthen the central nervous system and nourish the brain."
- o  "[I]s helpful for hormonal balancing, PMS, weight control…"

**Sensual Lips**

- o  "[S]timulates fat cells below lip tissue increasing the size of your lips."
- o  "[E]xpand the cellular substructure of your lips…"

**Sun Warrior Ginsing Moisturizer™**

- o  "[P]rovide healing…benefits to the skin…"
- o  "[K]nown to protect again (sic) infections with its antibacterial and antiviral properties."
- o  "[A]ssist the body's ability to utilize oxygen on a cellular level."

**NuGen HP**

- o  "Fuller Thicker Hair In As Little As Two Months"
- o  "[A] natural alternative to combat hair loss…"
- o  "Restore thinning hair with visible results"
- o  "[R]estores and maintains healthy hair."
- o  "[P]roven to prevent DHT…from attaching to the hair follicle…"
- o  "[W]orks to balance the hormones in the follicle…"
- o  "[T]o restore thickness and prevent more hair from falling out."
- o  "Nugen HP − The All-Natural Hair Restoration System?

- o "[R]evitalizes your hair follicles stimulating fuller, thicker hair."

**She Max HP**

- "She-Max HP contains natural herbs that have been proven to have the following actions: antibacterial, anti-depressant, anti-fatigue, aphrodisiac, improves: endurance, mental performance, physical performance, works as a urogenital tonic and uterine stimulant. Improves and maximizes ability to achieve orgasmic pleasure."

- "SHE-MAX stimulates sexual energy by expanding the blood vessels causing increased blood flow to the genital area causing increased sexual stimulation and sensation."

- "SHE-MAX HP contains the most essential active ingredients scientifically proven to enhance neurotransmission and blood flow in regions of the brain and genital organs that control sensation and sexual function!"

**V Max HP**

- "VMAX HP™ is helping men of all ages . . . overcome erectile dysfunction naturally!"

- "VMAX HP stimulates sexual energy by expanding the blood vessels causing increased blood flow to the penis."

- " . . . contains three active ingredients to help your body produce the proper blood flow to the penis."

- "To further enhance the erection process, VMAX HP™ contains the extract of the herb Ginko Biloba, which recently has been heavily documented for its ability to relax the body's arteries and improve blood flow."

- "VEP Protein . . . is a powerful vasodilator that further helps open flood vessels and increase circulation to the penis."

- "Erectile Dysfunction"

- Section entitled "Erectile Dysfunction Facts"

- "Results have shown over 80% success rate in treating Erectile Dysfunction."

- "I would like to share my clinical experience with using VMAX topical lotion for the treatment of erectile dysfunction . . . a valuable adjunct in treating the condition of erectile dysfunction; by increasing vascular flow to the penis and increasing the production of nitric oxide."

- "I am 48 and experienced ED for the first time a few months ago . . . that is when I began using VMAX HP –it works the same [as Viagra] without the side effects."

Your Nu Essentials Royal Jelly Capsules, NuMan Male Enhancement Capsules, Star's Male Potency Tonic, Sculpting Crème, Royal Touch – Anti-Wrinkle Serum, Realyze Under Eye Seryum, proEASE Wild Yam Cream, ProK Professional Strength Vitamin K Cream, proDHEA™ Transdermal DHEA Cream, Professional Formulas Natural Analgesic Cream, proGen Anti-Aging Natural Growth Hormone Precursor Cream, ProPhytogen Cream, Sensual Lips, Sun Warrior Ginsing Moisturizer™, NuGen HP, She Max HP, and V Max HP products are not generally recognized as safe and effective for the above referenced uses, and, therefore the products are "new drugs" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally introduced or delivered for introduction into interstate commerce without prior approval from FDA, as described in sections 301(d) and 505(a) of the Act [21 U.S.C. 331(d), 355(a)]. FDA approves a new drug on the basis of scientific data and information demonstrating that the drug is safe and effective.

A drug is misbranded under section 502(f)(1) of the Act [21 U.S.C. 352(f)(1)] if the drug fails to bear adequate directions for its intended use(s). "Adequate directions for use" means directions under which a layperson can use a drug safely and for the purposes for which it is intended (21 CFR 201.5). Prescription drugs, as defined in section 503(b)(1)(A) of the Act [21 U.S.C. 353(b)(1)(A)], can only be used safely at the direction, and under the supervision, of a licensed practitioner.

Your Nu Essentials Royal Jelly Capsules, NuMan Male Enhancement Capsules and Star's Male Potency Tonic products are intended for treatment of one or more diseases that are not amenable to self-diagnosis or treatment without the supervision of a licensed practitioner. Therefore, it is impossible to write adequate directions for a layperson to use your products safely for their intended purposes. Accordingly, your Nu Essentials Royal Jelly Capsules, NuMan Male Enhancement Capsules and Star's Male Potency Tonic products fail to bear adequate directions for their intended use and, therefore, the products are misbranded under section 502(f)(1) of the Act [21 U.S.C. 352(f)(1)]. The introduction or delivery for introduction into interstate commerce of these misbranded drugs violates section 301(a) of the Act [21 U.S.C. 331(a)].

**Adulterated Dietary Supplements**

The inspection revealed the following significant violations of the CGMP requirements for dietary supplements. These violations cause your dietary supplement products to be adulterated under section 402(g)(1) of the Act [21 U.S.C. § 342(g)(1)] in that they have been prepared, packed, or held under conditions which do not meet the CGMP regulations for dietary supplements in 21, Code of Federal Regulations, Part 111.

Our investigators observed specific violations, including, but not limited to, the following:

1.   You failed to establish and follow written procedures for the responsibilities of the quality control operations, including written procedures for conducting a material review and making a disposition decision, as required by 21 CFR 111.103. Specifically, you stated that you had not established written quality control procedures during the inspection.

Additionally, once you have established your written procedure for quality control you must implement quality control operations into your manufacturing, packaging, labeling, and holding operations, as required by 21 CFR 111.65.

2.   You failed to prepare a written master manufacturing record for each unique formulation of dietary supplement that you manufacture, and for each batch size, to ensure uniformity in the finished batch from batch to batch as required by 21 CFR 111.205(a).

Specifically, you stated that you have not established master manufacturing records for any of your dietary supplement products and that you provide your staff with verbal production instructions and do not prepare written master manufacturing records for your dietary supplement products.

3.   You also failed to prepare a batch production record every time you manufactured a batch of a dietary supplement as required by 21 CFR 111.255(a).

Specifically, you told our investigator that your firm does not establish batch production records for the majority of your dietary supplement products.

4.   You failed to establish specifications for points, steps, or stages in the manufacturing process where control is necessary to ensure the quality of the dietary supplement and that the dietary supplement is packaged and labeled as specified in the master manufacturing record, as required by 21 CFR 111.70. Specifically,

    a.  You failed to establish specifications for each component that you use in the manufacture of a dietary supplement. Specifically, you failed to establish the following: an identity specification; specifications to ensure purity, strength and composition of dietary supplements manufactured using the components are met; and specifications that establish the limits on those types of contamination that may adulterate or may lead to adulteration of the finished batch of the dietary supplement to ensure the quality of the dietary supplement, as required by 21 CFR 111.70(b)(1)-(3).

    Once you have established component specifications and before using a component, you must conduct at least one appropriate test or examination to verify the identity of any component that is a dietary ingredient, as required by 21 CFR 111.75(a)(1)(i), unless you petition the agency under 21 CFR 111.75(a)(1)(ii) and the agency exempts you from such testing, and you must confirm the identity of other components and determine whether other applicable component specifications established in accordance with 21 CFR 111.70(b) are met, as required by 21 CFR 111.75(a)(2).

    b.  You failed to establish specifications for dietary supplement labels (labeling specifications) and for packaging that may come in contact with dietary supplements (packaging specifications), as required by 21 CFR 111.70(d).

c.  You failed to establish specification for each dietary supplement that you manufacture, specifications for the identity, purity, strength, and composition of the finished batch of the dietary supplement, and for limits on those types of contamination that may adulterate, or that may lead to adulteration of, the finished batch of the dietary supplement to ensure the quality of the dietary supplement as required by 21 CFR 111.70(e).

Once you have established the above specifications, you must determine whether the specifications have been met as required by 21 CFR 111.75(c). We also note that you must make and keep records for established specifications, as required by 21 CFR 111.95(b)(1).

d.  You failed to establish specifications that provide sufficient assurance that the product you receive from a supplier for packaging or labeling as a dietary supplement (and for distribution rather than for return to the supplier) is adequately identified and is consistent with your purchase order, as required by 21 CFR 111.70(f).

e.  You failed to establish specifications for the packaging and labeling of the finished packaged and labeled dietary supplements, including specifications that ensure that you used the specified packaging and that you applied the specified label, as required by 21 CFR 111.70(g).

**Adulterated Drugs**

In addition, our investigators identified significant violations of current good manufacturing practice (CGMP) regulations for finished pharmaceuticals, Title 21, Code of Federal Regulations, Parts 210 and 211. These violations cause your drug products to be adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. 351(a)(2)(B), in that the methods used in, or the facilities or controls used for, their manufacture, processing, packing, or holding do not conform to, or are not operated or administered in conformity with, CGMP."

Our investigators observed specific violations, including, but not limited to, the following.

1.  Your firm failed to establish a quality control unit with the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products (21 CFR 211.22(a)).

Your firm lacks a quality control unit and any documentation of quality control review or approval of any of the firm's procedures or operations.

In response to this letter, provide your corrective actions to ensure that you establish a quality control unit with the responsibilities and authorities specified above.

2.  Your firm does not have, for each batch of drug product, appropriate laboratory determination of satisfactory conformance to final specifications for the drug product, including the identity and strength of each active ingredient, prior to release (21 CFR 211.165(a)).

You released finished drug products without testing your drug products to determine if they conformed to specifications.

In response to this letter, describe your corrective action plan to ensure that your drug products are tested before release.

3.  Your firm failed to establish written procedures for production and process control designed to assure that the drug products you manufacture have the identity, strength, quality, and purity they purport or are represented to possess (21 CFR 211.100(a)).

Your firm has not validated the manufacturing processes for each of your drug products. Documented, successful process validation shows that each step of a manufacturing process is controlled and provides confidence that finished drug products meet all quality attributes, including specifications.

See FDA's guidance document, Process Validation: General Principles and Practices, for FDA's current thinking on elements of process validation at http://www.fda.gov/downloads/Drugs/.../Guidances/UCM070336.pdf (/media/71021/download).

In response to this letter, provide your complete process validation plan and specify the dates by which you expect to complete validation for each of your drug products. Also include the interim steps you will take to ensure the quality of your drug products prior to completing your validation activities.

4.  Your firm failed to ensure that your drug product bore an expiration date that was supported by appropriate stability testing (21 CFR

211.137(a)).

You have not established a written testing program to assess the stability characteristics of the drug products you manufacture. You do not have any data to support the two-year expiration date you assigned to all your drug products.

In response to this letter, provide a copy of your stability testing procedures of your drug products. For each product, specify the stability-indicating methods and acceptance criteria you will rely on for each test to support the labeled storage conditions and expiry dates for your drug products.

5.   Your firm failed to establish and follow written procedures for the preparation of master production and control records designed to assure uniformity from batch to batch (21 CFR 211.186(a)). Your firm also failed to prepare batch production and control records for each batch of drug product produced that include an accurate reproduction of the appropriate master production or control record, checked for accuracy, dated, and signed (21 CFR 211.188(a)).

You do not have master production and control records for any of your drug products. Furthermore, you do not prepare batch production and control records for any of your drug products. Instead you provide verbal manufacturing instructions to your staff.

In response to this letter, provide a copy of your master production and control records for each of your drug products to assure the uniformity of your drug products from batch to batch. Also provide a copy of one executed batch production and control record for each of your drug products.

6.   Your firm failed to establish and follow adequate written procedures describing the handling of all written and oral complaints regarding a drug product, including provisions for review by the quality control unit of any complaint involving the possible failure of a drug product to meet any of its specifications and, for such drug products, a determination as to the need for an investigation in accordance with 21 CFR 211.192 (21 CFR 211.198).

You have not established procedures to handle complaints for any of your drug products.

In response to this letter, provide a copy of your written procedures to handle all complaints about your drug products.

**Misbranded Dietary Supplements**

Additionally, your dietary supplement products are misbranded under Section 403 of the Act [21 U.S.C. § 343], in that they fail to comply with the labeling requirements for dietary supplements. Your label violations include the following:

1.   Your Contour Too Breast Enhancing Capsules, ProPhytogen Plus, and NuMan Male Enhancement Capsule products are misbranded within the meaning of section 403(s)(2)(B) of the Act [21 U.S.C. § 343 (s)(2)(B)] because the product labels fail to identify the products using the term "dietary supplement", as required by 21 CFR 101.3(g).

2.   Your Contour Too Breast Enhancing Capsules, Bentonite Magma, ProPhytogen Plus, and NuMan Male Enhancement Capsule products are misbranded within the meaning of section 403(y) of the Act [21 U.S.C. § 343(y)] in that the labels fail to bear a domestic address or domestic phone number through which the responsible person (as described in section 761) may receive a report of a serious adverse event with such dietary supplement. "Domestic address or domestic phone number" means a complete address or phone number. The labels for these products do not include complete addresses or phone numbers.

3.   Your Liu Jun Zi Tang product is misbranded within the meaning of section 403(f) of the Act [21 U.S.C. §343(f)] because the product label contains the product name in a foreign language, but does not repeat all the required information in both English and the foreign language. As required by 21 CFR 101.15(c), if a product label contains any representation in a foreign language or foreign characters, all words, statements, and other information required by or under authority of the Act to appear on the label must appear in the foreign language.

4.   Your Clear Spiro, Contour Too Breast Enhancing Capsules, and Liu Jun Zi Tang products are misbranded within the meaning of section 403(r)(6)(C) of the Act [21 U.S.C. §343(r)(6)(C)] because the labels bear structure/function claims but fails to bear the required FDA dietary supplement disclaimer as required by, 21 CFR 101.93(c). Under section 403(r)(6) of the Act, a dietary supplement may bear certain claims, generally called "structure/function claims," on its label or in its labeling provided that the firm has substantiation that the claim is truthful and not misleading; the firm has notified FDA within 30 days of marketing the product bearing the claim; and the claim includes a mandatory disclaimer.

5.   Your NuMan Male Enhancement Capsule, Clear Spiro, and Liu Jun Zi Tang products are misbranded within the meaning of section 403(i)(2) of the Act [21 U.S.C. §343(i)(2)] in that the product labels fail to declare the common or usual names of each ingredient used, as required by 21 CFR 101.36 and 21 CFR 101.4. For example, "Horny Goat Weed", "Que Bracho", "White Atractylodes", "Ledebouriella", and "Morus" are not standardized common names as noted in Herbs of Commerce. The Latin binomial name of a botanical is required when the botanical lacks a standardized common name.

**Conclusion**

The violations cited in this letter are not meant to be an all-inclusive statement of violations that exist in connection with your products and their labeling. It is your responsibility to ensure that all your products comply with the Act and its implementing regulations.

We offer you the following dietary supplement labeling comments:

o   Your Bentonite Magma product label bears the statement "Percent Daily Values are based on a 2,000 calorie diet." This statement is only permitted when the percent of Daily Value is declared for total fat, saturated fat, total carbohydrate, dietary fiber, or protein as required by 21 CFR 101.9(c) and 21 CFR 101.36(b)(2)(iii)(D).

o   Your Bentonite Magma product label places the (b)(2)-dietary ingredients in an incorrect order which does not follow the order provided under 21 CFR 101.36(b)(2).

o   Your Clear Spiro and Liu Jun Zi Tang products list dietary ingredients in the Supplement Facts labels along with additional text that is a further description of the dietary ingredient but in Latin terms. We note that the Latin binomial name of a botanical may be listed in parentheses following the standardized common name of a botanical consistent in accordance with 21 CFR 101.4.

o   Your ProPhytogen Plus and Bentonite Magma product labels do not follow the format requirements under 21 CFR 101.36(e), such as the requirements for heavy bar placement.

You should take prompt action to correct the violations cited in this letter and prevent their future recurrence. Failure to promptly correct these violations may result in legal action without further notice. The Act authorizes the seizure of illegal products and injunctions against manufacturers and distributors of those products [21 U.S.C. §§ 332 and 334].

Please notify this office in writing within fifteen (15) working days from your receipt of this letter as to the specific steps you have taken to correct the violations noted above. Your response should include any documentation that would assist in evaluating your corrections. If you cannot complete all corrections within fifteen (15) working days, please explain the reason for the delay and the date by which the corrections will be completed.

Please direct your response to my attention at the address above. If you have any questions about the content of this letter you may contact Janice L. King, Compliance Officer, at 843-746-2990, X16 or by email at Janice.king@fda.hhs.gov (mailto:Janice.king@fda.hhs.gov).

Sincerely,
/S/
Ingrid A. Zambrana
District Director
U.S. Food & Drug Adminisration
FDA Atlanta District
Office of Human and Animal Foods- Division 3 East
(Georgia- North Carolina-South Carolina)
Office of Regulatory Affairs

⊖ More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)

# EXHIBIT 5

WARNING LETTER

# Andropharm, LLC

**MARCS-CMS 522784 — JUNE 05, 2017**

**Recipient:**

Andropharm, LLC
United States

**Issuing Office:**

Dallas District Office
United States



Office of Pharmaceutical Quality Operations, Division II
4040 N. Central Expressway, Suite 300
Dallas, Texas 75204

**June 5, 2017**

**CMS Case # 522784**

WARNING LETTER

**VIA UPS EXPRESS**

Anthony J. Ventrella, President
AndroPharm LLC
1140 Holland Drive, Suite 12
Boca Raton, Florida 33487

Dear Mr. Ventrella:

This is to advise you that your firm's marketing and distribution of the products "Sten Z" and "M1 Alpha" violates the Federal Food, Drug, and Cosmetic Act (FD&C Act), as described below.

According to your product labels, your products contain the following ingredients:

- **Sten Z:** 2,17a-Dimethyl-17b-hydroxy-5a-androst-1-en-3-one and 17b-hydroxy-2a, 17b-dimethyl-5a-

androstan-3-one-azine

- **M1 Alpha:** Methyl-1-Etiocholenolol-Epietiocholanollone

"Sten Z" and "M1 Alpha" are represented as dietary supplements on their labels and other labeling; however, these products do not meet the definition of a dietary supplement in section 201(ff) of the FD&C Act [21 U.S.C. § 321(ff)]. To be a dietary supplement, a product must, among other things, "bear[ ] or contain[ ] one or more ... dietary ingredients" as defined in section 201(ff)(1) of the FD&C Act [21 U.S.C.§ 321(ff)(1)]. Section 201(ff)(1) defines "dietary ingredient" as a vitamin; mineral; amino acid; herb or other botanical; dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract or combination of any dietary ingredient from the preceding categories.

The following ingredients listed on your product labels are synthetic steroids and do not constitute dietary ingredients under section 201(ff)(1) of the FD&C Act: 2,17a-Dimethyl-17b-hydroxy-5a-androst-1-en-3-one; 17b-hydroxy-2a, 17b-dimethyl-5a-androstan-3-one-azine; and methyl-1-etiocholenolol-epietiocholanollone. Therefore, because "Sten Z" and "M1 Alpha" do not bear or contain any dietary ingredients as defined in section 201(ff)(1) of the FD&C Act, the products are not dietary supplements under section 201(ff) of the FD&C Act.

Further, your product labels include claims about the effects of these products, such as the following:

**Sten Z**
- "Activate Numerous Anabolic Pathways"
- "Increase Muscle Mass"

**M1 Alpha**
- "Explosive Muscle & Strength Gains"
- "Highly Anabolic"

Under section 201(g)(1)(C) of the FD&C Act [21 U.S.C. § 321(g)(1)(C)], products (other than foods) that are intended to affect the structure or function of the body are defined as drugs. The intended use of a product may be determined by, among other things, its labeling, advertising, and the circumstances surrounding its distribution. 21 C.F.R. § 201.128. Your products are intended to affect the structure or function of the body by, among other things, building muscle and increasing strength. Accordingly, "Sten Z" and "M1 Alpha" are drugs.

Moreover, these products are "new drugs," as defined by section 201(p) of the FD&C Act [21 U.S.C. § 321 (p)], because they are not generally recognized as safe and effective for their labeled uses. The introduction or delivery for introduction, or causing the introduction or delivery for introduction, of any new drug lacking an FDA-approved new drug application (NDA) is a violation of sections 301(d) and 505(a) of the FD&C Act [21 U.S.C. §§ 33 1(d) and 355(a)]. Your sale of the new drugs "Sten Z" and "M1 Alpha" without approved NDAs violates these provisions of the FD&C Act.

Furthermore, your products are "prescription drugs" as defined at section 503(b)(1)(A) of the FD&C Act [21 U.S.C. § 353(b)(1)(A)], in that because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, it is not safe for use except under the supervision of a practitioner licensed by law to administer it. Indeed, all anabolic steroid drugs which have been approved for marketing by the FDA are limited by an approved new drug application to use under the professional supervision of a practitioner licensed by law to administer such drug. Anabolic steroids may cause serious long-term adverse health consequences in men, women, and children. These include liver toxicity, testicular atrophy and male infertility, breast enlargement in males, short stature in children, adverse effects on blood lipid levels, and a potential to increase the risk of heart attack and stroke.

According to section 502(f)(1) of the FD&C Act [21 U.S.C. § 352(f)(1)], a drug is misbranded if, among other things, it fails to bear adequate directions for its intended use(s). "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended. 21 C.F.R. § 201.5. Prescription drugs can only be used safely at the direction, and under the supervision, of a licensed practitioner. Therefore, it is impossible to write "adequate directions for use" for prescription drugs. FDA-approved drugs which bear their FDA-approved labeling are exempt from the requirement that they bear adequate directions for use by a layperson. But otherwise, all prescription drugs by definition lack adequate directions for use by a layperson. 21 U.S.C. § 352(f)(1); 21 U.S.C. § 353(b)(2).

In light of the fact that they are unapproved prescription drugs, the labeling of "Sten Z" and "M1 Alpha" fails to bear adequate directions for the products' intended uses; therefore, the products are misbranded under section 502(f)(1) of the FD&C Act [21 U.S.C. § 352(f)(1)]. Because they

lack the required approved application, these drugs are not exempt from this requirement under 21 C.F.R. § 201.115. Therefore, the introduction or delivery for introduction, or causing the introduction or delivery for introduction, into interstate commerce of these misbranded products violates section 301(a) of the FD&C Act [21 U.S.C. § 331(a)].

The violations cited in this letter are not intended to be an all-inclusive statement of violations that exist in connection with your products. You are responsible for investigating and determining the causes of the violations identified above and for preventing their recurrence or the occurrence of other violations. It is your responsibility to ensure that your firm complies with all requirements of federal law and FDA regulations.

You should take prompt action to correct the violations cited in this letter. Failure to promptly correct these violations may result in legal action without further notice, including, without limitation, seizure and injunction. Other federal agencies may take this Warning Letter into account when considering the award of contracts.

Within fifteen working days of receipt of this letter, please notify this office in writing of the specific steps you have taken to correct violations. Include an explanation of each step being taken to prevent the recurrence of violations, as well as copies of related documentation. If you cannot complete corrective action within fifteen working days, state the reason for the delay and the time within which you will complete the correction. Furthermore, please advise this office what actions you will take to address product that you have already distributed. Additionally, if another firm manufactures the products identified above, your reply should include the name and address of the manufacturer. If the firm from which you receive the products is not the manufacturer, please include the name of your supplier in addition to the manufacturer. Your written notification should refer to the Warning Letter Number above (**CMS Case # 522784**).

Please address your reply to John W. Diehl, Acting Director, Compliance Branch at the FDA address provided on the first page of this letter. In addition, please submit a signed copy of your response on your firm's letterhead to john.diehl@fda.hhs.gov (mailto:john.diehl@fda.hhs.gov).

If you have questions regarding the contents of this letter, please contact John W. Diehl at (214) 253-5288.

Sincerely,
/S/
Monica R. Maxwell
Acting Program Division Director
Office of Pharmaceutical Quality Operations, Division II

CC:

Anthony J. Ventrella
9200 Rutledge Avenue
Boca Raton, Florida 33434

Anthony J. Ventrella
8583 Breezy Oak Way
Boynton Beach, Florida 33473

 More Warning Letters (/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters)